UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JTH TAX LLC d/b/a LIBERTY TAX
SERVICE f/k/a JTH TAX, INC.,

                 Plaintiff,    **REPORT AND RECOMMENDATION**

                                  22-cv-01542 (JS) (JMW)

           -against-

EDWARD KUKLA; KARLY JEANTY;
HARLINE JEANTY AND EXPERT TAX
CONSULTANTS LLC,

                 Defendants.
------------------------------------------------------------X

**James Messenger**
**JoAnna Marie Doherty**
**Peter G. Siachos**
Gordon Rees Scully Mansukhani, LLP
One Battery Park Plaza
28th Floor
New York, NY 10004
*For Plaintiff JTH Tax LLC d/b/a Liberty Tax Service*
*f/k/a JTH Tax, Inc.*

*No Appearance by Defendants*
*Edward Kukla, Karly Jeanty,*
*Harline Jeanty, Expert Tax Consultants, LLC*

**WICKS,** Magistrate Judge:

       Plaintiff JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Plaintiff" or "Liberty") commenced this action against Defendants Edward Kukla ("Kukla"), Karly Jeanty ("Karly"), Harline Jeanty ("Harline") and Expert Tax Consultants LLC ("ETC") (collectively "Defendants") seeking injunctive relief and damages in connection with Defendants' alleged breaches of certain post-termination covenants and obligations contained in Liberty's franchise

1

agreement. (*See* DE 1.) Before the Court on referral from the Honorable Joanna Seybert is Liberty's unopposed motion for a preliminary injunction. (DE 4.) For the reasons that follow, the undersigned respectfully recommends that Liberty's motion for a preliminary injunction be GRANTED.

## I.   FACTUAL BACKGROUND

### A. Liberty's Franchise System

Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of New York. (DE 1, ¶ 18.) Liberty spends substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® tax preparation system, which sells income tax preparation and filing services and products to the public under Liberty's various trademarks. (*Id.* at ¶ 19.)

Liberty owns the federally registered Liberty Tax Service® trademarks, service marks, logos and derivations thereof (the "Marks"). (*Id.* at ¶ 19.) Franchisees license the Marks pursuant to a franchise agreement. (*Id.*) Liberty discloses in confidence certain confidential information and trade secrets, including Liberty's confidential Operations Manual, methods of operation, customer information and records, and marketing information, to franchisees. (*Id.* at ¶ 20.)

### B. The Franchise Agreements

On November 21, 2014, Kukla and Karly entered into a franchise agreement with Liberty for the territory designated as NY551, in and around Elmont, New York ("2014 Franchise Agreement"). (*Id.* at ¶ 24.) On January 6, 2017, Kukla and Karly entered into a second franchise agreement with Liberty for the territory, designated as NY524, in and around Elmont, New York ("2017 Franchise Agreement," together with the 2014 Franchise Agreement as the "Franchise Agreements"). (*Id.* at 26.) Karly subsequently assigned her interests under the Franchise

2

Agreements to Kukla but agreed "to remain bound by the post-termination covenants" in the Franchise Agreements. (*Id.* at ¶¶ 26-27; Ex. C at ¶ 3).[1] The 2014 Franchise Agreement expired in 2019 and was not renewed. (*Id.* at ¶ 24, n.1.)

Kukla (and, prior to the assignment, Karly) operated a Liberty tax preparation business with office locations at 474 Hempstead Turnpike, Elmont, New York 11003 ("Hempstead Location") and 237-11 Linden Boulevard, Elmont NY 11003 ("Linden Location") (collectively the "Franchise Locations"). (*Id.* at ¶¶ 2, 28.) Liberty alleges that according to an IRS database, ETC's registered business address is the Hempstead Location, and ETC's point of contact is Harline, a relative of Karly. (*Id.* at ¶¶ 54, 57; Ex. G.) Also, according to ETC's registration with the New York Department of State Division of Corporations, ETC's address is the Hempstead Location and ETC's Registered Agent is Harline. (*Id.* at ¶¶ 55-56; Ex. H.)

Under the Franchise Agreements, Kukla and Karly agreed to, *inter alia*, certain post-termination obligations. Specifically, upon termination of the Franchise Agreements, Kukla and Karly agreed, *inter alia*, to immediately:

(1) transfer to Liberty all telephone numbers used in relation to the former Liberty franchise;

(2) deliver to Liberty any original and all copies of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business;[2]

(3) deliver to Liberty originals and all copies of customer tax returns, files and records;

(4) return all copies of Liberty's confidential Operations Manual;

(5) assign to Liberty (if Liberty elects) any lease related to the Franchised

---

[1] For convenience, the Court adopts the exhibit markings designated by Liberty in its Complaint, rather than the numeration of the exhibits indicated on ECF.

[2] "Franchised Business" is defined by the 2017 Franchise Agreement as the "franchise that utilizes Liberty's system and Liberty's trade names, service marks, and trademarks…" (DE 1, Ex. B at § 1).

3

>    Business;
>
>    (6) adhere to the Franchise Agreement's post-termination non-competition and non-solicitation covenants; and
>
>    (7) forever refrain from using Liberty's Confidential Information.

(*Id.* at ¶¶ 31, 34; Exs. A-B at §§ 9, 12.) Kukla and Karly further agreed, pursuant to Section 10(h) of the Franchise Agreements "that the provisions of Section 10 are reasonable, valid and not contrary to the public interest" (*Id.* at ¶39; Ex. B at §10(h).) Kukla and Karly agreed to "waive all defenses to the strict enforcement of Section 10," and further agreed that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10." (*Id.*)

### C. Termination of the 2017 Franchise Agreement by Liberty

Liberty alleges that it first learned Kukla had breached the 2017 Franchise Agreement in or around December 2021 and issued, on December 8, 2021, four "Notice to Cure Default" letters, one for each alleged breach. (*Id.* at ¶¶ 43-44; Ex. D.) In February 2022 Liberty learned of three additional breaches by Kukla and therefore issued another three "Notice to Cure Default" letters on February 9, 2022. (*Id.* at ¶¶ 45-46; Ex. E.) Liberty alleges that Kukla failed to cure the breaches set forth in the Notices to Cure Default letters and therefore, on or about February 21, 2022, Liberty terminated the 2017 Franchise Agreement, issuing a termination notice to Kukla ("Termination Notice") (*Id.* at ¶ 47; Ex. F.)

### D. Defendants' Alleged Failure to Abide by the Post-Termination Obligations

Liberty maintains that since the termination of the 2017 Franchise Agreement, Defendants, through ETC and in express violation of Section 10(b)'s two-year, twenty-five mile post-termination covenant not to compete, have continued to operate a tax preparation businesses in competition with Liberty at the former Franchise Locations. (*Id.* at ¶¶ 58-61.)

4

Specifically, Kukla and Karly have failed to:

(1) transfer to Liberty all telephone numbers used in relation to the Franchised Business;

(2) deliver to Liberty any original and all copies of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchise Business;

(3) deliver to Liberty any original and all copies of customer tax returns, files and records;

(4) return all copies of Liberty's confidential Operations Manual; and

(5) assign the leases for the Franchise Locations to Liberty following Liberty's requests for the assignments.

(*Id.* at ¶ 50.) Harline has assisted Kukla in violating Section 10(b) through the creation and operation of ETC. (*Id.* at ¶ 5.) Further, Kukla has maintained possession and control over the Franchise Locations at which Defendants are currently offering electronic filing of tax returns. (*Id.* at ¶¶ 51, 58.) Liberty alleges that in doing so, Defendants are using Liberty's confidential information and trade secrets, such the unreturned Operations Manual, Liberty's customer lists, business know-how and operational and marketing trade secrets to unlawfully compete with Liberty, in violation of the 2017 Franchise Agreement. (*Id.* at ¶ 58.) Liberty also asserts that Defendants have diverted tax preparation fees or royalties that should have been paid to Liberty or that another franchisee would pay to Liberty. (*Id.* ¶ 60.) Liberty argues that absent an injunction, Defendants will continue to offer electronic filing of tax returns at the Franchise Locations, and use Liberty's Confidential Information and trade secrets, in violation of the 2017 Franchise Agreement. (*Id.* at ¶ 59.)

## II.   PROCEDURAL BACKGROUND

Liberty commenced this action by Summons and Verified Complaint ("Complaint") on March 21, 2022. (*See* DE 1.) Liberty simultaneously filed a motion for a preliminary injunction

(the "Motion") (*see* DE 4) which Judge Seybert referred to the undersigned. (*See* Electronic Order dated March 22, 2022.) Each Defendant was served with a copy of the Complaint and the Motion (*see* DE 7, 11, 14, 15), however none of the Defendants appeared or opposed the Motion.

On April 1, 2022, the Court held a telephone conference to discuss the pending Motion and set a briefing and hearing schedule. (*See* DE 12.) During that conference, an attorney[3] informally appeared on behalf of Kukla and ETC, representing that he was in the process of being retained and expected to file a notice of appearance within two business days. (*Id.*)

On April 12, 2022, having still not received appearances from any of the Defendants, and no opposition to the Motion, the Court converted a previously scheduled oral argument for April 14, 2022, to a status conference. (*See* Electronic Order dated April 12, 2022.) During the status conference, counsel for Kukla and ETC again informally appeared and represented that he may be appearing on behalf of all four Defendants. (*See* DE 17.) The Court directed that if such counsel is to appear on behalf of all four Defendants, a notice of appearance must be filed by close of business, and if no notice of appearance is filed, the Court will consider Liberty's Motion to be fully submitted. (*Id.*) The Court also granted Liberty, in light of new factual developments presented at the status conference, leave to submit a supplemental letter stating any changes to the relief sought in the Motion. (*Id.*)

On April 15, 2022, Plaintiff filed a supplemental letter requestion to modify Paragraph 2A of its Proposed Order (*see* DE 1, Ex. 4) to specifically reference ETC as follows:[4]

> "Kukla, Karly Jeanty, **Expert Tax Consultants LLC.**, and all those acting by, through or in concert with them, are enjoined from directly or indirectly, for a fee or charge, preparing or electronically filing income tax returns, or offering Financial Products (as defined in the 2017 Franchise Agreement), within the Territory (as defined in the 2017 Franchise Agreement) or within twenty-five (25)

---

[3] Vano Haroutunian, Esq. is the attorney who informally appeared at the court conferences.

[4] The new text proposed by Liberty has been bolded.

6

miles of the boundaries of the Territory, for two years following the entry of any injunction."

(*See* DE 18.) The Court incorporates this modified relief to its analysis of Liberty's Motion below.

### III.   LEGAL STANDARD

Preliminary injunctions are governed by Fed. R. Civ. P. 65. A court may grant a preliminary injunction if the "plaintiff has shown (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [the plaintiff's] favor; and (4) that an injunction is in the public interest." *Abbott Lab'ys v. H&H Wholesale Servs., Inc.*, 670 F. App'x 6, 8 (2d Cir. 2016) (quotes omitted).

This Circuit also applies the "serious question" standard. "The serious questions standard permits a district court to grant a preliminary injunction ... where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quotes omitted); *see Gov't Emps. Ins. Co. v. Relief Med., P.C.,* No. 20-CV-2165 (MKB), 2021 WL 3565739, at *9 (E.D.N.Y. Aug. 12, 2021). Accordingly, a movant has to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)) (emphasis added).

In the franchise setting, it is by now beyond cavil that a court may enter a preliminary injunction against a non-signatory to a franchise agreement in order to enforce a non-compete provision. *See* Fed. R. Civ. P. 65(d)(2); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d

7

186, 200 (E.D.N.Y. 2013) (enjoining non-signatory son of franchisee operating a competing business after termination of the franchise agreement); *see also Jackson Hewitt, Inc. v. Barnes*, No. 10-CV-05108 DMC JAD, 2011 WL 181431, at *2 (D.N.J. Jan. 18, 2011) (enjoining defendants' son, a non-signatory to the franchise agreement, who was assisting the defendant avoid the restrictions of a non-compete covenant contained in the franchise agreement); *Fitness Together Franchise, L.L.C v. EM Fitness, L.L.C.*, 2020 WL 6119470, at *11 (D. Colo. Oct. 16, 2020) ("Regarding the covenant not to compete, although the [franchisee's business entities] are not signatories to the Franchise Agreements, the court will not allow [the franchisee] to use the [franchisee's business entities] as a vehicle to circumvent those agreements: non-signatories may not avoid an injunction simply by being non-signatories to a franchise agreement.") (quotes omitted).

It is against this backdrop that the Court considers Liberty's Motion.

## IV.    DISCUSSION

### A. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotations omitted). "This element is so critical to the Court's inquiry that the Court need not reach any of the other requirements necessary for the grant of injunctive relief where irreparable harm has not been demonstrated." *Clark v. Childs*, 416 F. Supp. 3d 221, 223 (E.D.N.Y. 2017). Accordingly, the Court will address this element first.

Liberty argues irreparable harm is inherent where a franchisee operates a competing business out of the same locations. (DE 4, 14-15.) Liberty asserts the Defendants' violations of the 2017 Franchise Agreement have caused and will continue to cause irreparable harm to

Liberty's goodwill, reputation, and relationship with both customers and with its other franchisees. (*Id.* at 15.)

"To satisfy the irreparable harm requirement, [plaintiffs] must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Clark*, 416 F. Supp. at 223. The plaintiff must show that the continuing harm cannot be adequately redressed by final relief on the merits and money damages cannot provide adequate compensation. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

If Liberty failed to demonstrate "irreparable harm," the Court could end its inquiry here and deny the Motion. *See Kwik Ticket Inc. by Shamah v. Spiewak*, No. 20-CV-01201 (FB), 2020 WL 1643485, at *2 (E.D.N.Y. Apr. 2, 2020). However, the facts of this case support a finding that Liberty will be irreparably harmed without an injunction enforcing the non-compete and non-solicitation covenants found in the 2017 Franchise Agreement. As Liberty urges, "[t]here is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor." *Golden Krust Patties, Inc.*, 957 F. Supp. at 195. Not only is there harm to Liberty's good will and reputation with its customers as a result of the alleged breaches (*see ServiceMaster Residential/Com. Servs., L.P. v. Westchester Cleaning Servs.*, Inc., No. 01 CIV. 2229 (JSM), 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001) ("There is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor") but "the franchise system itself is endangered if a franchise is permitted to avoid its

9

reasonable non-compete obligations." *See id.* at *4. Critically, the threat of irreparable harm is even more present where, as here, Defendants continue to operate the competing business out of the same location as the Franchise Locations. *Golden Krust Patties, Inc.*, 957 F. Supp. at 195 ("This danger is even more inherent here, where defendants continue to operate out of the same location as the former Franchise").

In addition, other courts across the country have found irreparable harm to Liberty in the absence of an injunction under similar circumstances. *See, e.g., JTH Tax, LLC v. Williams-Eton*, 2020 WL 4708705, at *4 (E.D. Va. June 1, 2020) (a franchisor's "loss of customers and damage to goodwill and customer loyalty, constitute irreparable injury."); *JTH Tax, Inc. v. Boone*, 2009 WL 10689518, at *6 (E.D. Va. May 7, 2009) ("Liberty has demonstrated that it will suffer irreparable injury as [former franchisee] is soliciting his former customers and operating a competing business, thus causing a loss of business as well as a loss of former and potential customers."); *JTH Tax, LLC v. Angel Johnson*, No. CV 21-747, 2021 WL 2379541, at *2 (E.D. La. June 10, 2021) ("Liberty being forced to compete for customers recruited by Liberty's proprietary information and business model . . . [a]ccordingly, the court finds that Liberty has established irreparable harm."); *JTH Tax LLC v. Gause*, No. 321CV00543FDWDCK, 2021 WL 5085347, at *1 (W.D.N.C. Nov. 1, 2021) ("Plaintiff has suffered, and will continue to suffer, irreparable harm to its ability to protect its confidential information, customer goodwill, and reputation through Defendants' continued violations of the post-termination obligations of the Agreements."); *JTH Tax, Inc. v. Abikarram*, No. 19-CV-60328, 2019 WL 2254816, at *4 (S.D. Fla. Mar. 22, 2019) ("Accordingly, the undersigned finds that Plaintiffs have met their burden regarding the irreparable injury element."); *JTH Tax LLC v. Silva*, No. 820CV00288MSSAEP, 2020 WL 3266568, at *1 (M.D. Fla. Mar. 11, 2020) ("Plaintiff will continue to suffer imminent,

irreparable harm, specifically the loss of customers and denigration of Liberty's well-established Mark, if Defendants are not immediately enjoined by this Court."); *JTH Tax LLC v. McHugh*, No. C20-329RSM, 2020 WL 1689731, at *3 (W.D. Wash. Apr. 7, 2020) ("The Court previously ruled and continues to find that Plaintiffs have made the required showing of irreparable harm by arguing that Defendants' actions risk a loss of customer goodwill and damage to the franchisee system.")

For these reasons, the Court finds that Liberty will suffer irreparable harm without the issuance of an injunction.

B. **Likelihood of Success on the Merits**

Turning to the next prong, the Court finds that Liberty has demonstrated a likelihood of success on the merits of its claims, and in the very least, raised sufficiently serious questions regarding the merits to satisfy the preliminary injunction standard.

i. **Liberty's Claim for Breach of the 2017 Franchise Agreement (Count I)**

Liberty alleges that Kukla and Karly have materially breached the 2017 Franchise Agreement by violating its post-termination non-competition and non-solicitation covenants. (DE 1, ¶¶ 62-74.)

As an initial matter, the Court must address which state's law applies to Liberty's common law claims such as breach of contract. The 2017 Franchise Agreement contains a choice-of-law provision stating that Virginia law shall govern the agreement. (DE 1, Ex. B at § 17.) "Under New York's choice-of-law rules, courts will honor a contractual choice-of-law provision if it bears a reasonable relationship to the dispute." *ServiceMaster Residential/Com. Servs., L.P.*, 2001 WL 396520 at *2. Because Liberty's principal place of business is in Virginia (*see* DE 1, ¶ 8), the reasonable relationship test is satisfied. *See Lynx Tech. Partners, Inc. v. Pitts Mgmt. Assocs., Inc.*, No. 18CV3881(ENV)(PK), 2021 WL 2516111 at *2 (E.D.N.Y. June 6, 2021) ("As a matter of

11

law, a party has sufficient contacts to support a contractual choice-of-law provision in the state where it maintains its principal place of business"); *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017) ("The fact that one of the parties' principal place of business is in the selected forum is enough to satisfy the reasonable relationship test"). Further, there is no indication that application of the choice-of-law provision would violate public policy. *See Lynx Tech Partners, Inc.*, 2021 WL 2516111, at *2 ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction"); *JTH Tax, Inc. v. Sawhney*, No. 19-CV-4035 (AJN), 2019 WL 3051760, at *2 (S.D.N.Y. July 11, 2019) ("Liberty's principal place of business in Virginia meets this standard, and there is no indication that Virginia's breach of contract law violates public policy.") Accordingly, Virginia law governs the Liberty's claim for breach of contract.

Moving on to the merits of Liberty's breach of contract claim, under Virginia law "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004).

Here, Liberty has demonstrated that Defendants are bound by legally enforceable non-competition and no-solicitation obligations to Liberty under the 2017 Franchise Agreement. The Complaint sufficiently establishes that Defendants have breached those non-competition and non-solicitation obligations by continuing to file tax returns and solicit business from the Franchise Locations, despite the termination of the 2017 Franchise Agreement. Kukla and Karly have failed to

12

> (1) transfer to Liberty all telephone numbers used in relation to the Franchised Business;
>
> (2) deliver to Liberty any original and all copies of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchise Business;
>
> (3) deliver to Liberty any original and all copies of customer tax returns, files and records;
>
> (4) return all copies of Liberty's confidential Operations Manual; and
>
> (5) assign the leases for the Franchise Locations to Liberty following Liberty's requests for the assignments.

As a result of these breaches, Liberty has suffered damages, including lost revenues in the form of diverted tax preparation fees and royalties. (*See* DE 1, ¶¶ 60, 70-71.) Therefore, the Court finds that Liberty is likely to succeed on the merits of its breach of contract claim.

### ii. Liberty's Claim for Violation of Defend Trade Secrets Act of 2016 (Count II)

Liberty alleges Kukla and Karly have unlawfully continued to use Liberty's confidential information and trade secrets through ETC during and after the termination 2017 Franchise Agreement in connection with tax preparation service, done to divert revenues from Liberty. (DE 1, ¶¶ 75-91).

To state a claim for the misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") a plaintiff must show that it is (1) "[a]n owner of a trade secret;" (2) the trade secret was "misappropriated;" and (3) "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *New York Packaging II LLC v. Mustang Mktg. Grp. LLC*, No. 21CV01629(JMA)(ARL), 2022 WL 604136, at *4 (E.D.N.Y. Mar. 1, 2022).

Liberty sufficiently demonstrated that it is the owner of trade secrets. The DTSA defines trade secret" to include all forms and types of business information that the owner has taken

reasonable measures to keep secret and that derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. *See* 18 U.S.C. § 1839(3). Here, the information contained in Liberty's confidential Operations Manual, methods of operation, customer information and records, and marketing information, are trade secrets. Each of these items are not readily ascertainable by the public as they are disclosed only to franchisees in the operation of a franchised business pursuant to a franchise agreement. (DE 1, ¶ 79.) *See New York Packaging II LLC*, 2022 WL 604136, at *5 ("Generally, information that is readily ascertainable through public sources cannot be a trade secret. . ."). Liberty adequately alleges that it took reasonable steps to protect these trade secrets, as required by the DTSA. *See* 18 U.S.C. § 1839(3). Specifically, Franchisees are licensed to use Liberty's trade secrets only pursuant to a Franchise Agreement, which explicitly requires the delivery of all originals and copies of the Operations Manual and customer lists and records to Liberty upon termination of the Franchise Agreement, requires former franchisees and their representatives to maintain the confidentiality of the information, and requires former franchisees and their representatives to never use the information for any purpose other than operating a franchised business pursuant to the Franchise Agreement. (DE 1, ¶ 83.) Further, Liberty enforces its interest in its trade secrets by initiating legal recourse against those who misappropriate its trade secrets. (*Id.* at ¶¶ 82-83, Exs. A-B at § 10(h).)

Liberty also sufficiently demonstrates that Kukla and Karly, through ETC, have misappropriated those trade secrets by failing to return Liberty's trade secrets following the termination of the 2017 Franchise Agreement and by using the same in the operation of a competing tax preparation business. (*See* DE 1, ¶¶ 50-61.) These trade secrets relate to products

14

and services used in interstate commerce because Liberty's trade secrets, such as the confidential Operations Manual, methods of operation, customer information and records, and marketing information, are provided to a nationwide network of franchisees, who use the trade secrets in the operation of Liberty franchises throughout the country.

For these reasons, the Court finds that Liberty is likely to succeed on the merits of its claim for misappropriation of trade secrets.

### iii. Liberty's Claim for Tortious Interference (Count V)

Liberty alleges that ETC and Harline intentionally interfered with the 2017 Franchise Agreement by facilitating Kukla and Karly's unlawful competition with Liberty and as a result of such interference, Kukla and Karly breached the 2017 Franchise Agreement. (DE 1, ¶¶ 105-112.)

Under Virginia law, the necessary elements to establish a prima facie case of tortious interference are: (1) the existence of a valid contract with a third party; (2) that the defendant had knowledge of the third-party contract; (3) that the defendant intentionally interfered with the third-party contract; and (4) that the interference caused damage. *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216, 754 S.E.2d 313, 318 (2014).

Liberty has sufficiently pled that the 2017 Franchise Agreement is a valid contract (*see* Point IV.B.i, *supra*), known to both Harline and ETC (DE 1, ¶¶ 107-09) and that Harline and ETC knew of the existence of the 2017 Franchise Agreement through Harline's relationship with Karly as the Registered Agent and IRS point of contact. Additionally, Liberty maintains that ETC at all times knew of the existence of the 2017 Franchise Agreement through Kukla's involvement in ETC. (*Id.* at ¶ 108.) The record suggests that Harline and ETC intentionally interfered with the 2017 Franchise Agreement by coordinating with Kukla and Karly Jeanty to operate a competing

tax preparation business at the Franchise Locations and as a result Liberty has been damaged. (*Id.* at ¶¶ 50-61, 111.)

    **C.   Balance of the Equities and Public Interest**

"In assessing the balance of equities, the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 49 (S.D.N.Y. 2020) (internal quotes omitted).

While the Court does not take lightly the potential harm to Defendants which will result from an injunction, Liberty has demonstrated that any hardship Defendants may suffer would stem from their own breaches of the 2017 Franchise Agreement (*Golden Krust Patties, Inc.,* 957 F. Supp. 2d at 186 ("Based on the facts. . . any harm appears to stem from defendants' own wrongful conduct in passing off a competitor's product as a Golden Krust product and continuing to capitalize on plaintiffs' and the former Franchise's good will after termination of the Franchise. In such circumstances, the Court cannot say the harm to defendants outweighs the harm to plaintiffs"); *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, No. 10 CIV. 8976 (RJH), 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) ("Any hardship defendants would suffer from an injunction would stem from their own breaches of the Agreement and the Non–Competition Agreement"). Equity does not require Liberty to suffer because Defendants did not comply with the terms of the 2017 Franchise Agreement, and where, as here, Defendants were hardly unaware of the terms of the Agreement, were provided notice of their breaches, and were expressly aware that in the event of such breaches Liberty would seek relief in the form of an injunction. *See id.*; DE 1, Ex. B at §10(h) ("Liberty is entitled to a

16

temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10). Conversely, as discussed above, the denial of an injunction will adversely affect Liberty, its good will, reputation, and its franchisees. *See* Point IV.A, *supra*. What is more, the public has an interest this Court upholding contracts and enforcing restrictive covenants. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, No. 19CV7103(SJF)(ARL), 2020 WL 1129773 (E.D.N.Y. Mar. 9, 2020) ("If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements"). Under these circumstances, the balance of hardships and the public interest weighs in favor of an injunction.

### D. Bond

The Court must consider whether a bond is appropriate in this case. Pursuant to Rule 65(c) a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65. A district court is vested with wide discretion to determine the appropriate amount of the bond or whether a bond is warranted altogether. *See Golden Krust Patties, Inc.*, 957 F. Supp. at 202 (citing *Doctor's Assocs. Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).

Liberty argues that the Court should not require a bond because Kukla and Karly expressly agreed in Section 10(h) of the 2017 Franchise Agreement to waive the bond requirement. (*See* DE 4, 19; DE 1, Ex. B at §10(h) ("You hereby waive any requirement that Liberty post a bond related to any…injunctions requested as a result of an alleged violation of Sections 9 and 10.") Under similar circumstances, courts have bound parties to the contractual terms of Liberty's franchise agreement and granted injunctive relief without the requirement of a bond. *See, e.g., JTH Tax,*

17

*Inc. v. Aime*, No. 2:16CV279, 2016 WL 4182743, at *6 (E.D. Va. Aug. 3, 2016) ("Therefore, substantial evidence exists to support the Magistrate Judge's finding that 'Defendants waived any requirement that bond ought to be posted'"); *JTH Tax LLC v. Kelly*, No. 3:20-CV-05484-RJB, 2020 WL 6504979, at *1 (W.D. Wash. Aug. 19, 2020) ("Because it appears that Mr. Kelly waived his right to an injunction bond, no bond is required"); *JTH Tax, LLC v. Williams-Eton*, 2020 WL 4708705, at *5 ("Because 'the Court can exercise its discretion in binding the parties by their contractual terms,' and because Plaintiffs have 'sufficient resources to provide damages to Defendants if they prevail,' a bond is hereby WAIVED"); *JTH Tax, Inc. v. Magnotte*, No. 19-CV-11607, 2020 WL 127949, at *5 (E.D. Mich. Jan. 10, 2020) ("The Magnottes have waived the bond requirement of Federal Rule of Civil Procedure 65(c), so Liberty is not required to give any amount of security to the Court.")  So too here, the Court finds that the parties contracted away the requirement of a bond in the event of an injunction and therefore no bond is required.

## CONCLUSION

Based on the forgoing, the undersigned respectfully recommends to the Honorable Joanna Seybert that Liberty's motion for a preliminary injunction be granted.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of

Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated: Central Islip, New York
       April 26, 2022

/s/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge